UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

James Peterson, et al.,

       Plaintiffs,

v.

Seagate US LLC, et al.,

       Defendants.

MEMORANDUM OPINION
AND ORDER
Civil No. 07-2502

_____

     Dan Kohrman, Laurie McCann and Thomas Osborne, AARP Foundation Litigation, Beth E. Bertelson and Andrea R. Ostapowich, Bertelson Law Offices, P.A., and Dorene R. Sarnoski, Dorene R. Sarnoski Law Office for and on behalf of Plaintiffs.

     Marko J. Mrkonich, Kathryn Mrkonich Wilson and Susan K. Fitzke, Littler Mendelson for and on behalf of Defendants.

_____

     This matter is before the Court upon Defendants Seagate US LLC, Seagate

Technology, Seagate, Seagate Technology, Inc., Seagate Technology LLC, Seagate

Technology (US) Holdings, Inc., Seagate Technology US LLC, Seagate Software,

Inc. and Seagate Holdings, LLC's (collectively referred to herein as "Seagate")

Motion for Decertification, to Strike Plaintiffs' Expert and for Summary Judgment

on the Disparate Impact Claim.

1

**Factual Background**

Based on financial projections in 2004, Seagate announced anticipated reduced earnings due to weakened demand and adverse market characteristics. In response to these projections, Seagate's executive council concluded the company needed to take cost-reduction measures to address the revenue shortfall. (Fitzke Dec. [Doc. No. 33], Ex. 10 (Pope Dep. at 20-21); Ex. 8 (Dexheimer Dep. at 23-24); Ex. 12 (Watkins Dep. at 77-78).) The executive council thereafter identified an overall cost-reduction target, which was then relayed to Seagate's Corporate Management Committee ("CMC"). (Id., Ex. 8 (Dexheimer Dep. at 24-27).) The CMC determined that employee headcount needed to be reduced. The CMC members were given cost-reduction targets, which they in turn brought to their organizations to determine the next steps. (Id., Ex. 7 (Davidson Dep. at 22).) The CMC issued broad guidelines as to how to achieve the cost-reduction target, through the adoption of the Special Incentive Retirement Plan ("SIRP") and dissemination of general guidelines regarding employee selection for a company-wide reduction in force (the "RIF"). (Id. at 21-22; Def. Ex. 35 (Hall Decl. ¶¶ 22-28, Ex. A).)

Plaintiffs are former employees of Seagate who were terminated either by participating in the SIRP or through the RIF.  Plaintiffs were all over the age of forty at the time their employment was terminated, and have brought this collective action under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.  In the Complaint, Plaintiffs assert the following causes of action: Count I, Age Discrimination under the ADEA (Disparate Treatment) Collective Action; Count II, Age Discrimination under the ADEA (Disparate Impact) Collective Action; Count III, Age Discrimination (Disparate Treatment) Individual Claims; and Count IV, Declaratory Relief that the Releases Are Invalid.

It is Plaintiffs' position that the SIRP and the RIF had an adverse impact on employees over the age of forty.  In addition, Plaintiffs assert that Seagate engaged in a pattern or practice of age discrimination through the SIRP and the RIF.  In support, Plaintiffs have alleged that as a result of the guidelines created by the CMC, Seagate subjected them all - regardless of location, supervisor or job duties - to a centralized, company-wide, age-based plan to terminate them in the summer of 2004.  Plaintiffs allege that this common scheme resulted in a termination rate of 10.3% for older workers, which is more than double the rate

for younger workers, which was 4.5%.  (Fitzke Decl. [Doc. No. 330], Ex. 6

(Bendick Report ¶ 11).)  Plaintiffs also allege that they have submitted extensive

anecdotal evidence that links Seagate's policies to the results.  For example,

evidence has been submitted to show that top executives made ageist remarks.

**Procedural History**

The Court granted Plaintiffs' motion for conditional class certification

under the ADEA in October 2008, on the basis that Plaintiffs had met their initial

burden of demonstrating that they were victims of a single discriminatory policy,

practice, custom or plan.  (Order dated October 24, 2008 [Doc. No. 120].)  The

Court further authorized notice to be sent to 526 individuals, 45 of which have

consented to join as opt-in Plaintiffs.  At this time, there are 63 named and opt-in

Plaintiffs.

Prior to conditionally certifying the class, the Court granted Plaintiffs'

motion for partial summary judgment, finding that the releases offered to those

Plaintiffs terminated pursuant to the 2004 RIF were invalid as a matter of law.

(Order dated May 28, 2008 [Doc. No. 84].)  Thereafter, the Court adopted the

Report and Recommendation of Magistrate Judge Boylan, and granted Plaintiffs'

motion for partial summary judgment as to the Invalidity of the 2004 SIRP

4

Releases and denied Seagate's motion for summary judgment as to the claims of Plaintiff Paul Calcagno.  (Order dated February 8, 2011 [Doc. No. 361].)

**Motion for Decertification**

**A.      Legal Standard**

An action under the ADEA may be maintained against "any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated."  29 U.S.C. § 216(b).   "[T]he ADEA incorporates enforcement provisions of the Fair Labor Standards Act of 1938, and provides that the ADEA shall be enforced using certain of the powers, remedies, and procedures of the FLSA"  <u>Hoffmann-La Roche Inc. v. Sperling</u>, 493 U.S. 165, 167 (1989)(citation omitted).  The Court performs a two-step process to determine whether a case should be certified under the FLSA:

> First, the court determines whether the class should be conditionally certified for notification and discovery purposes.  At this stage, the plaintiffs need only establish a colorable basis for their claim that the putative class members were the victims of a single decision, policy, or plan.  In the second stage, which occurs after discovery is completed, the court conducts an inquiry into several factors, including the extent and consequences of disparate factual and employment settings of the individual plaintiffs, the various defenses available to the defendant that appear to be individual to each plaintiff, and other fairness and procedural considerations.

Dege v. Hutchinson Tech., Inc., Civil No. 06-3754 (DWF/RLE), 2007 WL 586787, at

*1 (D. Minn. Feb. 22, 2007) (unpublished) (citations omitted).

> In the first step,

> the Court only must determine whether Plaintiffs have come
> forward with evidence establishing a colorable basis that the
> putative class members are the victims of a single decision, policy, or
> plan.  The court does not make any credibility determinations or
> findings of fact with respect to contrary evidence presented by the
> parties at this initial stage.

Id. at *2 (citations omitted).  This Court held that Plaintiffs met the first step when

it issued its Order conditionally certifying the ADEA class.  This case is now at

the second step.

> At this stage, the court has much more information on which to base
> its decision, and makes a factual determination on the similarly
> situated question.  If the claimants are similarly situated, the district
> court allows the representative action to proceed to trial.  If the
> claimants are not similarly situated, the district court decertifies the
> class, and the opt-in plaintiffs are dismissed without prejudice.  The
> class representatives – i.e. the original plaintiffs – proceed to trial on
> their individual claims.

Carlson v. C.H. Robinson Worldwide, Inc., Civ. Nos. 02-3780 (JNE/JJG), 02-4261

(JNE/JJG), 2006 WL 2830015, at *3 (D. Minn. Sept. 26, 2006) (quoting Mooney v.

Aramco Servs., Inc., 54 F.3d 1207, 1213-14 (5th Cir. 1995) (footnote omitted),

overruled on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003)).

The merits of the Plaintiffs' claims are not considered with respect to whether decertification is appropriate.  Nerland v. Caribou Coffee Co., Inc., 564 F. Supp. 2d 1010, 1019 (D. Minn. 2007).  The Court's decision regarding decertification is within its discretion.  Id. at 1018.  "Plaintiffs bear the burden of establishing that they are similarly situated."  Id. (citation omitted).

At the decertification stage, to determine whether class members are similarly situated, the Court should consider such factors as age variance, type of termination, division in the company in which they worked, employment status, supervisors and salaries.  Ulvin v. N.W. Nat'l Life Ins. Co., 141 F.R.D. 130, 131 (D. Minn. 1991).

### 1.    Factual Disparities

#### a.    SIRP

It is Seagate's position that those class members terminated through the SIRP are not similarly situated to those class members terminated through the RIF.  The SIRP was offered to employees who would have been 60 years or older on or before January 2, 2005.  (Bertelson Aff., Ex. 4.)  Features of this program were full separation benefits and enhanced early retirement medical plan participation, depending on years experience and the age of the participant.  (Id.)

7

On the other hand, the RIF was not limited by the age of the employee, and was

focused on temporary employees and those employees with performance issues.

(Id.)   Seagate asserts that because the SIRP was a separate employment action

that was different in scope, communication and effect than the RIF, employees

terminated through one program are not similarly situated to those employees

terminated from the other program.  See, Ulvin v. N.W. Nat'l Life Ins. Co., 943

F.2d 862, 865-66 (8th Cir. 1991) (finding that as class members varied as to age,

year of termination, division in the company in which they worked, employment

status, supervisors and salaries, they were not similarly situated).

        Seagate further asserts that the SIRP was intended as a voluntary program,

while the RIF was involuntary.  Those employees who volunteered to participate

in SIRP have suffered no adverse employment action and are thus not similarly

situated with the RIF plaintiffs.  See Aliotta v. Bair, 614 F.3d 556, 565 (D.C. Cir.

2010) (finding that employees terminated through early retirement programs

should not be grouped with employees terminated involuntarily).  Plaintiffs

respond that employees terminated through SIRP were pressured to participate,

because if they did not, they would have been terminated in the RIF.  The

evidence demonstrates, however, that of the 503 SIRP eligible employees in 2004,

204 accepted SIRP benefits and 255 declined.  Of the 255 that declined, 30 were later selected for termination through the RIF.  (Estes Decl. ¶¶ 11-16.) Accordingly, only 12% of SIRP eligible employees were later terminated through the RIF.

Seagate further asserts that Plaintiffs' only allegation of impropriety concerning SIRP is that some Plaintiffs felt compelled or were pressured to elect SIRP benefits.  The fact specific nature of such a constructive discharge claim necessarily requires individualized proof not appropriate for class treatment. West v. Border Foods, Inc., Civil No. 05-2525, 2006 WL 1892527, at *9 (D. Minn. July 10, 2006).  Accordingly, even as to those Plaintiffs terminated through SIRP, they are not similarly situated.

As noted above, it is Plaintiffs' position that Seagate implemented a single, company-wide plan in the summer of 2004 to reduce its work-force, described by Seagate as the "RIF/SIRP Action."  The RIF/SIRP Action involved all Seagate U.S. facilities and the same guidelines, timeline and communications were used at each location.  (Bertelson Aff., Exs. 1-6, 10-11, 14, 17, 23-25, 30, 34-35, 45, 61.)  For example, in one company document, the RIF/SIRP Action was described as "concurrent reduction in force initiatives" and because it was a global initiative,

9

"the Action required a functional, rather than site, implementation plan.  This

required the HR Team, including site HR, the Benefits Product Center, HRIT, and

Payroll working with Legal, IRC, the IT HelpDesk, Corporate Communication,

and Finance to adopt a common set of tools, processes, documents, and project

plan to successfully implement the Action"  (Id. Ex. 1.)

Plaintiffs thus argue that all class members are similarly situated because

they lost their jobs either through the SIRP or the RIF in 2004; all were full time

employees; subject to the same corporate-wide performance evaluation process;

all were part of the same corporate structure and that Executive Vice Presidents

had employees that crossed all reduction-affected areas; all Seagate locations

were affected by the RIF/SIRP Action; all received notice of termination during

the same time period; the 2004 RIF/SIRP Action was planned at the corporate

level and implemented with precision across the U.S.; the RIF/SIRP Action paid

out the same benefits to all, based on age, length of service; and Seagate reported

the RIF/SIRP Action as a joint plan on all corporate documents.

In support of their position that an early retirement program is not always

treated as distinct from age-based forced retirement, Plaintiffs note that in Glass

v. IDS Fin. Servs. Inc., the district court held that a class properly included

10

division managers that were either terminated, demoted or forced to resign or retire as part of a pattern or practice of age discrimination.  778 F. Supp. 1029, 1080-81 (D. Minn. 1991).  The class in <u>Glass</u>, however, included employees who held the same position, were compensated the same, were evaluated by the same objective standards and lost their positions during the same period.  The district court further held that since the EEOC was a party, the "similarly situated" standard did not apply.  <u>Id.</u> at 1081.

Plaintiffs further assert that this Court does not address the merits of a claim in deciding decertification, therefore the Court must not decide at this time whether the SIRP program was voluntary.  Plaintiffs argue that they have nonetheless put forth sufficient evidence at this stage to support their claims that employees terminated through SIRP did not do so voluntarily.  For example, Plaintiff Ron Dols believes he had to either retire or be terminated.  (Dols Dep. at 12 [Doc. 371-10].)  (<u>See</u> <u>also</u>, Calcagno Dep. at 58-59, 172-72 [Doc. No. 371-4](took early retirement after he was told he would otherwise be laid off); England Dep. at 89-90 [Doc. No. 371-13] (older employees strongly encouraged to accept SIRP benefits).)  Furthermore, the RIF/SIRP Action had features which reflect evidence of intentional age discrimination, as the SIRP was limited to older workers 60

11

years of age and up.  Seagate also allegedly made misleading inducements to

Plaintiffs regarding SIRP, designed to illegally reduce the number of older

workers.  For example, Seagate told SIRP eligible employees that the benefits

being offered were "one time only."  (Bertelson Aff., Exs. 13 and 15.)  Plaintiffs

assert that this was untrue because the same benefits were offered to those

terminated in the RIF.  Because some employees learned the benefits were the

same, they chose not to accept SIRP.  (Malik Dep. 135-36 [Doc. No. 371-43]; Ex.

69.)  Plaintiffs further assert that no evidence has been produced which shows

that managers were directed to make sure the SIRP was voluntary or that

employees would not be pressured to take it.  In fact, evidence has been

produced which demonstrates that managers may have been directed to "sell"

the SIRP.  (Bertelson Aff., Exs. 5, 6 and 8.)

Taking into consideration the relevant factors in determining whether to

decertify a class - age variance, type of termination, division in the company in

which they worked, employment status, supervisors and salaries - the Court

finds that employees terminated through SIRP are not similarly situated with

employees terminated through RIF.

The Court first notes that an early retirement program is not presumptively

discriminatory.  See Houghton v. SIPCO, Inc. 38 F.3d 953, 959 (8th Cir. 1994)

(finding that an offer of early retirement by itself does not violate ADEA, it

merely gives an advantage to older employees who are eligible to accept it);

Henn v. Nat'l Geographic Soc'y, 819 F.2d 824, 828 (7th Cir. 1987) (finding that an

early retirement plan is not presumptively discriminatory); Aliotta v. Bair, 576 F.

Supp.2d 113, 123 (D.D.C. 2008) (internal citations omitted) (finding that "[t]he

option of early retirement can be beneficial to eligible employees because, while

the risk in a RIF is shared by the entire workforce, the availability of an early

retirement option affords eligible employees . . . 'a means to mitigate that risk

which was not available to other employees.'  Indeed, courts have called early

retirement programs "in many situations, the fairest alternative available to a

company,' . . . and 'a humane practice'.  A voluntary buyout program combined

with early or normal retirement or resignation is not an adverse employment

practice.")

     Despite Plaintiffs' assertion that certain employees felt pressured to leave

their employment through SIRP, the facts show that other employees chose to

participate in the program.  If an employee voluntarily participated in SIRP,

he/she did not suffer an adverse employment action and is therefore not similarly

situated to employees involuntarily terminated pursuant to the RIF.  <u>See,</u> <u>Aliotta</u> at 123 (finding "a decision between early retirement and the risk of termination in a downsizing or reorganization is not sufficiently terrorizing to make acceptance of the early retirement incentive categorically involuntary.")  The fact that an employee could choose to participate in SIRP demonstrates a significant difference between the SIRP and the RIF.

The Court further finds that even among SIRP participants that have opted into this action, such Plaintiffs are not similarly situated.  To prove they were discriminated against on the basis of age, each Plaintiff terminated through SIRP must show that he/she was forced to participate and that age was the "but for" cause for such forced participation.  <u>See</u> <u>Rahlf v. Mo-Tech Corp., Inc.,</u> 642 F.3d 633, 637 (8th Cir. 2011).  Clearly, this determination will be fact specific to each Plaintiff.

The Court thus finds that class members terminated through SIRP are not similarly situated with class members terminated through RIF, or with each other.  The motion to decertify the claims of Plaintiffs whose employment was terminated through the SIRP will be granted.

14

###     b.      RIF

Seagate also argues that a class consisting of employees terminated

through the RIF should be decertified as the RIF class members are not similarly

situated to each other.  Seagate asserts the RIF was implemented in a de-

centralized manner, therefore Plaintiffs have failed to show the RIF plaintiffs

were subjected to one common policy or plan to eliminate older workers.  Ulvin,

141 F.R.D. at 131; Mooney v. Aramco Servs. Co., 54 F.3d 1207, 1215 (5th Cir. 1995);

Lusardi v. Xerox Corp., 122 F.R.D. 463, 465 (D.N.J. 1988).

In support, Seagate asserts the decisions regarding how to cut costs, which

positions to eliminate or consolidate and the criteria applied in selecting

employees for the RIF was delegated to various organizational vice presidents

and directors.  ([Doc. No. 95] (Hall Decl. ¶¶ 22-28).)  For example, in the

Transducer Development organization run by Ken Allen, employees were

classified by skill set.  Allen then imposed a forced ranking criteria to select

employees for the RIF.  (Allen Decl. ¶¶ 11-22 [Doc. No. 331].)  These criteria were

not used by other departments.  (Id.)   In the Advanced Assembly Development

organization, Randy Figarson, Senior Engineering Director, stated in his

declaration that he was responsible for selecting employees in his organization

15

for layoff.  (Figarson Decl. ¶ 11 [Doc. No. 336].)  Figarson stated that he

considered the following factors when making his RIF selections: 1) how

technology was evolving; 2) which employees had technical skills critical to

evolving technology, the launch of new products and the organization's mission;

3) technical expertise of the employee; and 4) past performance.  (Id. ¶ 12.)

Seagate further asserts that other employees were selected for the RIF

because their positions were entirely eliminated.  (Glembocki Decl. ¶ 5 [Doc. No.

99].)  Others were selected because their duties were automated or transferred to

other locations.  (Bernard Decl. ¶¶  12, 16 [Doc. No. 358]; Ibele Decl. ¶¶ 14-29

[Doc. No. 338].)

Seagate also asserts that the claims of those Plaintiffs terminated through

the RIF are not similarly situated because they performed different jobs, at

different grades and at different locations.  Within the conditionally certified

class, Plaintiffs worked in eight different locations, and held different job titles,

ranging from non-exempt Operators, administrative assistants, technicians,

exempt engineers, sales personnel, and management employees, including

Executive Directors.  They also received correspondingly different salaries.

Additionally, these Plaintiffs range in age from 41 to 67 years, and the length of

service ranged from 2 to 38 years.  Because of the various differences between the

RIF Plaintiffs, Seagate argues that decertification is appropriate.  See Koren v.

SuperValu, Inc., Civ. No. 00-1479 (ADM/AJB), 2003 WL 1572002, at *16 (D. Minn.

Mar. 14, 2003); Stone v. First Union Corp., 203 F.R.D. 532, 543 (S.D. Fla. 2001).

Plaintiffs respond that this case should proceed as a collective action as

there is evidence of a centralized plan or direction from the top as to the

implementation of the RIF.  In support, Plaintiffs have submitted a corporate

document entitled "RIF Guidelines" which provides: "Managers should choose

among employees in an affected job classification in the following order:

Contract/ Agency Temporary Employee; Active Employee Counseling - Final

Warning (within 12 months); Active Employee Counseling - (2) First Warnings

(within 12 months); "U" Performers; Employees with no performance appraisal

ratings on file; Performance - Lower Performers; Length of Service - When

performance is equal (Least senior goes first)."  (Id. Ex 4.)   Plaintiffs argue that

there is evidence that these guidelines were generally followed.  ([Doc. No. 371-

36] (Kenny Deposition at 43-44, testifying that all organizations followed the RIF

guidelines).)

Plaintiffs further argue that Seagate's position that RIF terminations were

based on specialized skills does not change the fact that corporate-wide plans

and guidelines nonetheless set the standard.  For example, the guidelines allow

the use of specialized skills to terminate an employee to override the objective

standards.  (Id. Ex. 4, p. 6 "*Specialized skills may be considered in isolated

instances where they are clearly shown and documented to be of overriding

importance.  VP and Human Resources must authorize any exceptions.")

Plaintiffs assert this exception was utilized repeatedly as to the class, including

Plaintiff Thomes, Walter, Knutson, Olszewski, James Peterson, and Legut.  In

addition, Seagate put in place a non-bump policy - which prevented employees

selected for layoff from bumping other employees.  (Id. Exs. 4 and 17.)  This

policy assured that once an older employee was knocked out, he/she would have

no way to remain with Seagate.

Furthermore, even where there is evidence of some decentralization, a

collective action may still be appropriate where there is evidence of a bias on the

part of top management.  Hyman, 982 F. Supp. at 4.  Plaintiffs have put forth

evidence that top management, including the President and CEO made ageist

remarks.  (Walter Dep. at 217-18 [Doc. No. 371-65]; Gaba Dep. at 19-20 [Doc. No.

371-19; Volant Dep. at 16 [Doc. No. 371-63]; Chwialskowski Dep. at 49 [Doc. No.

371-5].)  Plaintiffs further allege that older, terminated employees were forced to train in younger replacements, (Walseth Dep. at 17 [Doc. No. 371-64]) and that younger, less qualified employees were retained over older, more qualified employees.  (Kehrwald Dep. at 19 [Doc. No. 371-35].)  Plaintiffs further assert that younger employees were hired shortly before and shortly after the RIF.  (Coates Dep. at 17-18 [Doc. No. 371-6]; Herath Dep. at 57 [Doc. No. 371-28].)

To establish a prima facie case of pattern or practice discrimination, Plaintiffs must prove that Seagate regularly and purposefully treated employees over the age of 40 less favorably and that unlawful age discrimination was Seagate's regular procedure or policy.  EEOC v. McDonnell Douglas Corp., 191 F.3d 948, 951 (8th Cir. 1999).  "Proving isolated or sporadic discriminatory acts by the employer is insufficient . . . rather it must be established by a preponderance of the evidence that . . . 'discrimination was the company's standard operating procedure – the regular rather than the unusual practice.'"  Id.

Because the motion before the Court is one for decertification, the Court does not look to the merits of the Plaintiffs' pattern or practice claim.  Plaintiff need only make substantial allegations of class-wide discrimination, supported by affidavits or relevant statistics.  At this stage, the Court finds that Plaintiffs

have met their burden of putting forth sufficient evidence that age discrimination may have been the standard operating procedure with respect to those employees selected for termination through the RIF.  Evidence has been submitted that Seagate's President and CEO, as well as other executives, may have made ageist comments, and there is evidence to suggest that younger employees were hired shortly before and after the RIF, that certain Plaintiffs were forced to train younger replacements, and older employees selected for layoff could not bump a younger, less experienced employee.   Accordingly, the motion to decertify the RIF class is denied.

### 3.      Piggybacking

Seagate argues that should the Court grant their motion to decertify, all Plaintiffs, except Peterson and Olson, should be dismissed with prejudice as their claims are time-barred.  Seagate asserts there is no further basis to equitably toll the limitations period to permit re-filing as these Plaintiffs have not filed an administrative charge.  See Ruehl v. Viacom, 500 F.3d 375, 388 (3d Cir. 2007) (finding that "when a class is decertified because the plaintiffs are not 'similarly situated,' those plaintiffs are in a qualitatively different position than plaintiffs in a certified class, and our reasons for applying the single filing rule . . .[is]

inapplicable.")

Plaintiffs assert that should the Court decertify this action, the Plaintiffs

who did not personally file an EEOC charge should not have their claims

dismissed with prejudice.  In <u>Tolliver v. Xerox Corp.</u>, the Second Circuit held that

the single filing rule would apply even where a class had been decertified.  <u>Id.</u>

918 F.2d 1052, 1058-60 (2d Cir. 1990).

> The purpose of the administrative charge requirement is to afford the
> agency the opportunity to "seek to eliminate any alleged unlawful practice
> by informal methods of conciliation, conference, and persuasion." 29
> U.S.C. § 626(d).  If the agency charged with that task is satisfied that a
> timely filed administrative charge affords it sufficient opportunity to
> discharge these responsibilities with respect to similar grievances, it serves
> no administrative purpose to require the filing of repetitive ADEA charges
> any more than repetitive Title VII charges, . .  at least in the absence of
> statutory language compelling such a result.

<u>Id.</u> at 1057.  Here, the purposes of the administrative filing requirement was met

when Plaintiffs Peterson and Olson filed their administrative charges - the EEOC

and the employer were notified and thereby given the opportunity to resolve the

matter through informal methods.

Although the Court will decertify the collective action with respect to those

Plaintiffs terminated through SIRP, the Court will continue to allow these

Plaintiffs to piggyback on the administrative charges filed by Peterson and Olson.

21

As this Court held in its Order dated November 20, 2007, the administrative

charges filed by Peterson and Olson were sufficient to put Seagate on notice of

the class claims of age discrimination.  (Doc. No. 46).  The issue was again

addressed by Magistrate Judge Boylan in the Report and Recommendation dated

December 28, 2010, in which he recommended that this Court reject Seagate's

request to reconsider the prior decision allowing the class to piggyback on the

administrative charges filed by Peterson and Olson.  (Doc. No. 311 at 9.)  This

Court did deny the request to reconsider and adopted the Report and

Recommendation on February 8, 2011.  (Doc. No. 361).  Because Seagate

continues to offer no basis upon which this Court should reconsider its prior

decision, the request will again be denied.

**Motion to Strike Plaintiffs' Expert, Dr. Marc Bendick**

    **A.    Legal Standard**

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of
> fact to understand the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience, training or
> education, may testify thereto in the form of an opinion or otherwise if (1)
> the testimony is based upon sufficient facts or data, (2) the testimony is the
> product of reliable principles and methods, and (3) the witness has applied
> the principles and methods reliably to the facts of the case.

The role of the trial court is to serve as "gatekeepers to 'insure that the proffered expert testimony is both relevant and reliable.'" <u>Wagner v. Hesston Corp.</u>, 450 F.3d 756, 758 (8th Cir. 2006) (quoting <u>Anderson v. Raymond Corp.</u>, 340 F.3d 520, 523 (8th Cir. 2003)).  In <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, the Supreme Court provided some general observations for the lower courts to consider in making determinations as to whether the scientific knowledge is relevant and reliable, such as whether it has been tested, subjected to peer review and publication, what is the known or potential rate of error, and whether it is generally accepted. "  509 U.S. 579, 593-95 (1993).

In <u>Kumho Tire Company, Ltd. v. Carmichael</u>, the Court extended the <u>Daubert</u> reasoning to non-scientist experts stating:

> We conclude that <u>Daubert's</u> general principles apply to the expert matters described in Rule 702.  The Rule, in respect to all such matters, 'establishes a standard of evidentiary reliability.'  It 'requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility.'  And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of the [the relevant] discipline.'

526 U.S. 137, 149 (1999) (quoting <u>Daubert</u>, 509 U.S. at 590-92) (citation omitted).

When addressing the reliability factor, the Court held that "nothing in

either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit

opinion evidence that is connected to existing data only by the *ipse dixit* of the

expert.  A court may conclude that there is simply too great an analytical gap

between the data and the opinion proffered."  <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S.

136, 146 (1997).  Moreover,

> [T]he factual basis of an expert opinion goes to the credibility of the
> testimony, not the admissibility, and it is up to the opposing party to
> examine the factual basis for the opinion in cross-examination.  Only if the
> expert's opinion is so fundamentally unsupported that it can offer no
> assistance to the jury must such testimony be excluded.

<u>Bonner v. ISP Tech, Inc</u>., 259 F. 3d 924, 929-30 (8th Cir. 2001) (citing <u>Hose v.</u>

<u>Chicago NW. Transp. Co.</u>, 70 F. 3d 968, 974 (8th Cir. 1996)).

### B.    Whether Expert Report Is Relevant and/or Reliable

Marc Bendick earned his Ph.D. in economics from the University of

Wisconsin in 1975, and has been engaged in the full-time practice of economics,

specializing in employment and related issues, for the last 30 years.  (Fitzke Decl.,

Ex. 6 (Expert Report of Marc Bendick, Ph.D.))  He was retained by Plaintiffs to

analyze age patterns in the RIF/SIRP Action.  (<u>Id.</u> at 3.)  Based on his analysis, he

reached the following four conclusions: that in the RIF/SIRP Action, employees

over 40 years or older were terminated at a higher rate than those under 40 - the

termination rate being 10.3%, more than double the 4.5% rate for younger

workers; the age-related difference is statistically significant and cannot be

reasonably attributed to chance alone; a statistically significant age-related

difference remains after taking into account explanations other than age; and the

age-related difference in termination rates is consistent with social science

research documenting employers' conscious or unconscious bias against older

workers based on age stereotypes.  (Id. at 5.)

Seagate moves to strike this report as Bendick failed to disclose that his

methodology combines voluntary retirements with involuntary layoffs.  (Id., Ex.

15 (Bendick Dep. at 53, 56-58).)  Seagate asserts that Bendick's analysis assumes

that all 204 employees who elected SIRP would have been laid off had they

refused the offer.  Because only employees over age 60 were eligible for SIRP,

including this group among those terminated through RIF imparts an inevitable

bias to the results, which Bendick does not address in his report.

Based on the Court's finding that class members terminated through SIRP

are not similarly situated to class members terminated through the RIF, the Court

agrees that the SIRP and RIF must be analyzed separately.  Other courts have

disapproved the use of methodology that combines voluntary retirements with

involuntary retirements.  See, e.g., Libront v. Columbus McKinnon Corp., 832 F.

Supp. 597, 608 (W.D.N.Y. 1993); Aliotta, 614 F.3d at 566.

Seagate further asserts that Bendick's rebuttal report is unsound because it

concludes that the SIRP was categorically involuntary.  (Bertelson Aff. [Doc. No.

371], Ex. 18 (Bendick Rebuttal Report p. 17-22).)  The Court agrees that such a

conclusion is not supported by the record.  Accordingly, Bendick's statistical

analysis that combines SIRP and RIF data is excluded as irrelevant and

unreliable.  See Aliotta, 614 F.3d at 568-69 (finding that where plaintiff's expert's

statistics do not control for employee choice in a buyout, the statistics "tell us

nothing about why older employees took the buyouts, and are therefore not

relevant to determining whether [the employer] discriminated against them.")

Seagate argues that Bendick's report should be stricken for the additional

reason that he was not provided the documentation which shows the actual RIF

comparisons of Seagate's decision-makers.  Seagate's managers completed

Reorganization Employee Selection Justification ("RESJ") forms, which describes

why certain employees were chosen for the RIF (See, e.g., Madsen Decl., Ex. 1).

These forms document the actual comparison made by managers in determining

who would be subject to layoff.  These forms were not given to Bendick,

26

however.  As a result, Bendick invented his own comparator groups and performed statistical analyses.  A key flaw in Bendick's facts is that all employees are presumed to be candidates for termination.  (Bendick Dep. 128.)  Bendick created three comparison groups: job level, function and location.  (Id. at 129.) He then assigned all employees to one of three job levels: executive, professional and support employees.   He also assigned three work functions: engineering, administrative and manufacturing.  He then separated employees by location.

Bendick agreed the level and function categories were completely subjective, and that he created these categories without reference to how Seagate actually classified employees.  (Id. 97-100, 120-21.)  As Bendick lacks knowledge of job functions and individual titles, Seagate argues that he cannot opine with certainty that his model approximates groups of similarly situated employees.

Because the "facts" as to how employees were selected for RIF are in dispute, the Court finds that these arguments go to the weight of Bendick's analysis, not its admissibility.  Seagate will be free to cross-examine Bendick at trial concerning his RIF analysis and the facts underlying such analysis.

Finally, Seagate argues that Bendick's opinion as to age stereotyping is not supported by the evidence and is therefore inadmissible.  In Section VI of his

27

expert report, Bendick discussed employer bias based on age stereotypes.  Given

the existence of negative ageist stereotypes, Bendick concluded that his statistical

analysis of the Seagate SIRP/RIF is consistent the statistical patterns that result

when ageist stereotypes are applied.  (Fitzke Decl. [Doc. No. 330], Ex. 6 (Bendick

Report ¶ 34).)  Seagate argues that this opinion must be excluded as Bendick did

not perform an analysis as to whether any age-based stereotypes exist or existed

at Seagate.  Rather, the opinions are based on circular logic - there is evidence

based on studies and behavior of other employers that people in general have

negative ageist stereotypes - negative stereotypes may lead to adverse

employment actions - because Seagate took adverse actions against Plaintiffs,

they must have resulted from negative stereotypes.  The flaw in this logic is that

Seagate has provided legitimate, non-discriminatory reasons for its employment

decisions, and Bendick does not take these into consideration.

Plaintiffs argue that Bendick properly relied on well-supported research on

negative age-based stereotypes for the limited purpose of stating that his findings

of statistically significant age-related disparities in Seagate's 2004 RIF/SIRP

Action are consistent with research identifying the causes of age-related

disparities.  Other courts have admitted similar testimony.  Butler v. Home

Depot, Inc., 984 F. Supp. 1257 (N.D. Cal. 1997); Int'l Healthcare Exch., Inc. v.

Global Healthcare Exch., LLC, 470 F. Supp.2d 345 (S.D.N.Y. 2007).

In Wal-Mart Stores, Inc. v. Dukes, the plaintiffs had submitted expert

testimony from a sociological expert who testified that, based on a social

framework analysis, "Wal-Mart has a 'strong corporate culture' that makes it

'vulnerable' to gender bias."  131 S. Ct. 2541, 2553 (2011).  "He could not,

however, 'determine with any specificity how regularly stereotypes play a

meaningful role in employment decisions at Wal–Mart.  At his deposition . . . [the

expert] conceded that he could not calculate whether 0.5 percent or 95 percent of

the employment decisions at Wal–Mart might be determined by stereotyped

thinking.'"  Id.  (internal citation omitted).  The Supreme Court held that the

expert's testimony as to gender stereotyping could be disregarded, as it did not

address the question as to whether Wal-Mart operated under a general policy of

discrimination.  Id. at 2554.

As applied to this case, to the extent that Bendick would testify that age

stereotyping exists, such testimony is relevant and reliable and will not be

excluded.  Because Bendick did not perform an analysis as to whether any age-

based stereotypes existed at Seagate in 2004, however, he is precluded from

29

offering any testimony or opinion that age stereotyping was a factor in

identifying employees for the Seagate 2004 RIF.  In addition, given the Court's

finding that Bendick's statistical analysis that combined the numbers for the SIRP

and RIF is inadmissible, his statement that this statistical analyses are consistent

with age stereotyping no longer has a basis.

**Seagate's Motion for Partial Summary Judgment-Disparate Impact Claim.**

**A.      Standard**

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine issue as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Celotex, 477 U.S. at 323.  This burden can be met "by 'showing' -

that is, pointing out to the district court - that there is an absence of evidence to

support the nonmoving party's case."  Id. at 325.  The party opposing summary

judgment may not rest upon mere allegations or denials, but must set forth

specific facts showing that there is a genuine issue for trial.  Krenik v. County of

Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B.      Discussion**

Under the ADEA, "an employer is liable for age discrimination on a

disparate-impact theory if one of its policies has had an adverse effect upon

employees age forty and over . . . regardless of whether the employer actually

had a discriminatory intent." Clark v. Matthews Int'l Corp., 628 F.3d 462 (8th Cir.

2010) vacated in part on rehearing on other grounds, 639 F.3d 391 (8th Cir. 2011).

To prove a prima facie case, Plaintiffs must: "(1) identify a specific, facially

neutral employment practice and then (2) present 'statistical evidence of a kind

and degree sufficient' to show (3) that the practice caused an adverse

employment action (4) that disparately affected workers over age forty." Id.

In this case, Plaintiffs have identified the SIRP/RIF as the facially neutral

employment practice that had an adverse impact on employees over the age of

forty.  As discussed above, however, the SIRP and RIF were distinct programs,

and SIRP was only offered to employees over the age of sixty.  Employees that

chose to terminate their employment through SIRP did not suffer an adverse

employment action.  Accordingly, it would be inappropriate to include SIRP

under Plaintiffs' disparate impact claim.  See Libront, 832 F. Supp. at 617 (finding

that employees who voluntarily accepted early retirement benefits should not be

considered in statistics to reach a finding of disparate impact).  See also, Adams

v. Lucent Techs., Inc., No. 2:03CV300, 2007 WL 14593 (S.D. Ohio Jan. 3, 2007) aff'd

284 Fed. Appx. 296 (6th Cir. July 17, 2008) (holding that an early retirement

program offered to employees was not a neutral policy that could form the basis

for a disparate impact claim).

Seagate next argues that Plaintiffs have never identified a specific policy or

element of the RIF that had an adverse impact on older workers.  Plaintiffs

respond that they have identified a specific element of the RIF that has had an

adverse impact - the guidelines which allow for a subjective decision making

process.

Once a specific policy is identified, the Court must determine which

employees were subject to such policy.  Clark, 628 F.3d at 467.  Once the relevant

pool is identified, the Court must then determine the percentage of older

employees in the pool before and after the RIF.  Id. at 468 ("whether older

workers in the pool of non-management employees at the St. Louis Graphics

Division were disparately impacted by the terminations requires consideration of

the percentage of older employees in the group before and after the RIF")

(emphasis added); Chambers v. Metro. Prop. and Cas. Ins. Co., 351 F.3d 848 (8th

Cir. 2003) (finding that "statistical evidence is meaningless without some analysis of the age of the entire workforce []before and after the reduction in force.") EEOC, 191 F.3d at 952 (same).  Seagate argues that Plaintiffs have not submitted the relevant statistics to support their disparate impact claim.  Instead, Plaintiffs' expert provided a statistical analysis that improperly included employees terminated through SIRP.

Nevertheless, using the numbers contained in Table One of the Plaintiffs' expert report, the most relevant statistic is the percentage of employees over the age of forty that remain after a facially neutral policy has been implemented.  The total number of employees over the age of 40 before the SIRP and RIF was 7,530 and the total employees over age 40 was 5,018 - therefore 66.64% of employees before the SIRP and RIF were over the age of forty.  After the SIRP and RIF were implemented, the total number of employees was 6900 and the total number of employees over the age of forty was 4501, or 65.23%.  The Eighth Circuit has previously found that a 4% drop in employment rate of employees over the age of forty is not sufficiently substantial to create an inference that plaintiffs were terminated because of their age.  Clark, 628 F.3d at 469.

Nor is the percentage change substantial when looking at only those

terminated through the RIF.  After the SIRP election process closed, 204 eligible

employees elected to participate in SIRP.  (Fitzke Decl., Ex. 31 (Estes Decl. ¶ 10).)

Subtracting the 204 SIRP terminees, the percentage difference is substantially the

same -65.71% after the SIRP but before RIF, and 65.23% after the RIF.

Plaintiffs respond that a statistical analysis of the workforce before and

after the RIF is not mandated in the Eighth Circuit.  Rather, Eighth Circuit and

Supreme Court precedent provide that statistical analyses are not "framed in

terms of any rigid mathematical formula."  Teamsters v. United States, et al., 431

U.S. 324 (1977).  Instead, the statistical analyses need only raise a substantial

inference of discrimination.  Emanuel v. Marsh, 897 F.2d 1435, 1442 (8th Cir.

1990).

While the decisions in Clark, Chambers and EEOC are clear that an

analysis of the age of the entire workforce before and after a reduction in force

must be considered when determining the merits of a disparate impact claim,

even if other statistical analyses could sufficiently raise a substantial inference of

discrimination, Plaintiffs have failed to provide such an analysis.  The Court thus

finds that Seagate has demonstrated that it is entitled to judgment on the

disparate impact claim.

IT IS HEREBY ORDERED that:

1.      Defendants' Motion for Decertification is GRANTED in part and

DENIED in part.  Only those Plaintiffs terminated through RIF may

proceed as a collective action;

2.      Defendants' Motion to Exclude Expert Testimony is GRANTED in

part and DENIED in part as set forth in this Memorandum Opinion;

and

3.      Defendants' Motion for Partial Summary Judgment as to Plaintiffs'

Disparate Impact Claim is GRANTED.

Date:   August 15, 2011

s/ Michael J. Davis
Michael J. Davis
Chief Judge
United States District Court